UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

       Plaintiff,

v.

AL'S ASPHALT PAVING COMPANY, INC.
and EDWARD D. SWANSON,

       Defendants.

Case No. 2:23-cr-20699

Hon. Gershwin A. Drain

_____

**SENTENCING MEMORANDUM OF DEFENDANTS
EDWARD SWANSON AND AL'S ASPHALT**

**Sentencing Date: June 6, 2024, at 2:00 p.m.**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................1

II.    STANDARD.................................................................................................2

III.   ARGUMENT................................................................................................4

    A.   Ed Swanson's History, Background, Character, and Conduct
        Justify a  Probationary Sentence (§ 3553(a)(1)) ..................................4

        1.   Early Years.................................................................................4

        2.   Working with Dad.....................................................................5

        3.   Growing Up................................................................................6

        4.   Arrival at Al's Asphalt...............................................................7

        5.   Marriage and Family.................................................................7

        6.   Acting Like an Owner................................................................8

        7.   Taking Disappointment Well (Again) .....................................10

        8.   Impact on Others.....................................................................11

        9.   The Big Picture .......................................................................15

    B.   Ed Swanson is Remorseful, Poses Little to No Risk of
        Recidivism, and Poses No Threat to the Public (§
        3553(a)(2)(A)-(C)) ..............................................................................16

    C.   As to Defendant Al's Asphalt, The Court Should Impose a
        Sentence within the Parties' Jointly Recommended Sentencing
        Agreement Found in the Rule 11 Plea Agreement ...........................22

IV.    CONCLUSION...........................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Koon v. United States*,
    518 U.S. 81 (1996).........................................................................................16

*Pepper v. United States*,
    562 U.S. 476 (2011).........................................................................................3

*Shaw v. United States*,
    498 F. Supp. 3d 944 (E.D. Mich. 2020) ............................................................3

*United States v. Baker*,
    445 F.3d 987 (7th Cir. 2006) ...........................................................................19

*United States v. Collingwood*,
    461 F.3d 805 (6th Cir. 2006) ............................................................................3

*United States v. Coughlin*,
    2008 WL 313099 (W.D. Ark. Feb. 1, 2008) ...................................................16

*United States v. Fathalla*,
    No. 07-CR-87, 2008 WL 4501057 (E.D. Wis. Sept. 29, 2008) ......................19

*United States v. Kimbrough*,
    552 U.S. 85 (2007)............................................................................................3

*United States v. McQueen*,
    2006 WL 3206150 (S.D. Ind. Apr. 20, 2006)..................................................17

*United States v. Paul*,
    239 F. App'x 353 (9th Cir. 2007) ....................................................................19

*United States v. Sandoval-Enrique*,
    171 F. Supp. 3d 1190 (D.N.M. 2016)..............................................................20

*United States v. Smart*,
    518 F.3d 800 (10th Cir. 2008) ..........................................................................4

**Statutes**

15 U.S.C. § 1 ................................................................................................2

18 U.S.C. § 3013(a)(2)(B) ....................................................................22, 23

18 U.S.C. § 3553(a) ....................................................................................3, 4

**Other Authorities**

David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*....................................................20

Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science* ......................20

Ruben Castillo et al., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004)......................19

Ruben Castillo et al., *Recidivism and the "First Offender"* (May 2004) ..................................................................................................18

Tracy Kyckelhahn and Tricia Cooper, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017).........................18

## I.   INTRODUCTION

The story of Edward Donald Swanson is a story of faith, family, and fortitude. A story of hard work, perseverance, and kept promises.  In many ways, it is a modern example of the "American Dream," a phrase first coined during the Great Depression of the 1930s.[1]

As the Court will come to learn in this sentencing memorandum, Ed Swanson embodies the ideal of the American Dream.  His is an American success story – of success achieved through dedication and determination, despite modest beginnings. It's not a glamorous story.  Instead, it is a story filled with long hours of difficult manual labor during hot Detroit summers, and humble gratitude for the opportunity to work them.  Ed Swanson is a quiet, middle-aged man who has always been mature beyond his years.  He is a man who "takes disappointment well," as his father once told him, and who puts his faith, family, friends, employees, and even strangers before himself.    Throughout his 52 years he has made a lifelong habit of helping

---

[1] The American Dream is that dream of a land in which life should be better and richer and fuller for everyone, with opportunity for each according to ability or achievement…

It is not a dream of motor cars and high wages merely, but a dream of social order in which each man and each woman shall be able to attain to the fullest stature of which they are innately capable, and be recognized by others for what they are, regardless of the fortuitous circumstances of birth or position.

James Truslow Adams, The Epic of America (1931).

others, with no expectation that his kindness be returned or even acknowledged.  In fact, he would rather it wasn't acknowledged.  That has never been his quiet way.

But unfortunately, the story of Ed Swanson is also a cautionary tale.  A recent chapter brings him before this Court for sentencing after pleading guilty to two counts of Conspiracy to Restrain Trade in violation of 15 U.S.C. § 1, a Class C felony.  Yet, the many character letters attached as exhibits to this memorandum pay testament to the truth of this story: the world is a better place because of Ed Swanson.  He has spent his life showing kindness and mercy to others and is deserving of this Court's mercy at sentencing.

To that end, Mr. Swanson and his undersigned counsel respectfully submit that any term of incarceration is unnecessary if the Court examines the relevant facts and circumstances under the § 3553(a) factors and the whole story of Ed Swanson.  Instead, for the reasons more fully articulated below, it would be a reasonable exercise of this Court's discretion to impose a probationary sentence.  Probation would be sufficient but not greater than necessary to punish Mr. Swanson when balancing the seriousness of his offense against his character and other relevant sentencing considerations.

## II.    STANDARD

As the Court is well-aware, the Supreme Court's decision in *United States v. Booker* made the Federal Sentencing Guidelines merely advisory and gave district

court judges discretion to fashion an appropriate sentence by consulting the statutory factors set forth in 18 U.S.C. § 3553(a).  543 U.S. 220, 245 (2005).  "Informed by the knowledge that decades of social science has revealed — that crime does not persist in a vacuum — these factors account for a defendant's human qualities, rather than just criminal."  *Shaw v. United States*, 498 F. Supp. 3d 944, 958 (E.D. Mich. 2020).  Indeed, the Guidelines are just one of seven factors[2] that courts must consider when fulfilling their mandate to "impose a sentence sufficient, but not greater than necessary" pursuant to § 3553(a).  *United States v. Kimbrough*, 552 U.S. 85, 101 (2007); *United States v. Collingwood,* 461 F.3d 805, 807 (6th Cir. 2006).  These congressional factors ensure that a sentencing court not only sentences the crime at issue, but considers the individual being sentenced.

The Supreme Court has confirmed that evidence providing a complete, "up-to-date picture of [a defendant's] 'history and characteristics'" "is clearly relevant to the selection of an appropriate sentence."  *Pepper v. United States*, 562 U.S. 476, 492 (2011).  In fact, § 3553(a) grants courts the freedom to impose a sentence that

---

[2] In total, the § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, adequately deter criminal conduct, protect the public from further criminal activity, and provide for educational or vocational training, medical care, or other correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any pertinent policy statement from the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) restitution.

substantially deviates from the advisory Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id*. The Court does not need "extraordinary" characteristics and history to vary from the Guidelines. *United States v. Smart*, 518 F.3d 800, 808–09 (10th Cir. 2008).

## III.   ARGUMENT

### A.   Ed Swanson's History, Background, Character, and Conduct Justify a Probationary Sentence (§ 3553(a)(1)).

#### *1.   Early Years*

The metro Detroit area has been home to Ed Swanson for almost all his life. He is the eldest of Edward Harold and Doris Rita Swanson's five children, born in Dearborn in 1971. When he returned from the Vietnam War to Michigan, Ed Senior worked for his father (Ed's grandfather) for several years before striking out on his own in the construction industry hanging drywall. Ed's mother Doris worked as a teacher's assistant and at daycare centers, caring for other children when she wasn't caring for Ed and his brothers and sisters.

Although his upbringing was squarely "blue collar," and his parents "struggled at times," and although they "didn't have a lot," Ed Swanson's memories of his early years are overwhelmingly positive. Ed has no memory of his parents even arguing. He and his siblings followed his parents' good example, respecting their mom and dad and one another.

4

One early childhood memory stands out to Ed Swanson: moving out of the house his parents owned in Livonia where he spent the first seven years of his life. A contractor that Ed Senior worked for went out of business and stopped paying his tradesmen, including Ed Senior. That meant Ed Senior was stuck with his own bills from suppliers that he suddenly couldn't pay because he wasn't getting paid. But Ed Senior was an honorable man. His word was his bond. He sacrificed his young family's home, using the proceeds from its sale to pay his business debts. After that, the Swansons became renters and frequent movers. But they didn't let this setback discourage or divide them; instead, the family grew even closer.

### 2. *Working with Dad*

A few years later, Ed Swanson started working for his father, quickly becoming a familiar face at construction sites around metro Detroit at just 10 years old. Ed's younger brothers Rob and Mike soon followed in his footsteps. "Sorry Eddie, you've got to miss school today," Ed Senior would say. But Ed didn't mind. He knew being in a family meant helping each other, and Ed was happy to help however he could. So were Rob and Mike, and Ed's sisters Sandy and Becky.

At one point, Ed Senior drywalled Little Caesars restaurants throughout Southeast Michigan on a "weekend warrior" schedule. The restaurants would close on a Thursday evening, and Ed Senior would work almost around the clock to finish the work before Monday morning. While other kids spent these weekends

swimming and watching Saturday morning cartoons, Ed Swanson worked and slept next to his dad on Little Caesars floors.  Ed would hold his dad's ladder steady while Ed Senior hung drywall, looking out for his father just as his father looked out for him and his siblings, and their mother.  When his father passed away suddenly at just 49 years old after a short battle with kidney cancer, Ed took on the responsibility of looking after his mother and siblings as well as his own young family, gladly and without a second thought.

### 3.     Growing Up

School didn't come easily to young Ed Swanson.  It wasn't because he would have to miss class semi-regularly to work with his dad.  It wasn't because he was misbehaving or not paying attention.  It wasn't because he wasn't trying to learn.  It was simply hard for him, and he was eventually held back a year.  But thanks to tutoring, special attention from caring teachers, and his own persistence, Ed graduated from high school, earning his diploma at Taylor Center High in 1990.

After graduation, Ed continued to work for his father.  At the same time, he volunteered for a non-paying position with the Taylor Fire Department and enrolled in courses at Schoolcraft College, hoping to become licensed as an Emergency Medical Technician.  It didn't work out.  He decided a change of scenery might do him good, and so at 19 years old he decided to move to the Orlando, Florida area where his uncle lived.  Ed looked for construction work by driving to job sites and

offering to work for free on a trial basis, but folks were skeptical of a guy with a Northern accent and Michigan license plates.  Eventually, though, Ed caught on with a construction crew, earning the trust of the foreman when another worker didn't show up and Ed was able to step in and do the job so that the project wasn't delayed.

### 4.    *Arrival at Al's Asphalt*

After a hurricane derailed the construction industry in Florida, Ed and his new wife April Swanson returned to Southeast Michigan in late 1992, settling in Flat Rock.  In the spring of 1993, Ed began to work for Al's Asphalt Paving Company, Inc. – the company he now owns (and his co-Defendant in this case).  Ed knew the owners of Al's Asphalt from church and persuaded them to work him for a week and send him on his way if he didn't work out, just as he did with the construction crew down in Florida.  He hasn't worked anywhere else since.

Ed started at Al's Asphalt making $6.25 an hour as a laborer.  After building up years of sweat equity working 75 to 90 hours a week during hot summer paving seasons, he became an operator, a paving foreman, a supervisor, and eventually the company's Vice President of Operations in 2015.  For these first 22 years at Al's Asphalt, Ed worked mostly in the field, not the office.

### 5.    *Marriage and Family*

In a seasonal outdoor business like the asphalt paving industry, time and good weather are precious.  As the guy in the field, Ed worked as many hours as he could.

Unfortunately, this meant less time at home with April and their daughters Samantha (born in 1994) and Maikala (born in 1996).  And it meant more disappointment for Ed when his and April's marriage didn't survive.  They divorced in 1998 but remained amicable to each other and loving co-parents to Samantha and Maikala. Ed was always especially close with his daughters, and still is today.  Samantha, who graduated from Baker College with a degree in marketing, works full time with her dad as a sales assistant at Al's Asphalt.  Maikala earned a Master's in education from Concordia University and works part time for Al's when she's not pursuing her full-time passion as a schoolteacher.

Eventually, April remarried. So did Ed in 2000 to Betty, his wife of 24 years and counting.  Ed and Betty knew each other from high school and reconnected after Betty also went through a divorce around the same time as Ed and April.  Betty and Ed have two children together.  Their son Anthony is 21 years old and about to graduate a year ahead of schedule with a degree in business from the University of Michigan – Dearborn.  Like his older sisters, Anthony also works part time with Ed at Al's Asphalt.  Betty and Ed's youngest son, Frankie, is nearly 19 and attends Concordia University full-time.

## 6.    *Acting Like an Owner*

The Court is no doubt familiar with the well-worn trope "act like an owner." "Act like an owner" is sage advice in business and in one's personal life.  And it is a

mantra well-suited to Ed Swanson.  Owners (should) stay humble.  Owners (should) put others before themselves.  Owners (should) do the right thing because it's the right thing.

Acting like an owner in his personal life gave Ed Swanson the chance to act like and eventually become an owner in business, too – an owner of Al's Asphalt. When it wasn't the sunny season of 75 to 90-hour work weeks, Ed looked for other opportunities to stay busy.  Despite having no post-high school education (save for the few EMT training courses) and no business training, Ed volunteered to help the sales staff at Al's in the winter months, meeting with general contractors and assisting the sales team to pitch new work however he could.  Eventually, Ed learned how to bid paving jobs and became something of a salesperson himself, although he was still very much the guy in the field and the primary person responsible for making sure the work he sold got done well, on time, and on budget.

When one of the two primary owners of Al's Asphalt retired around 2008, Ed had another opportunity to learn more about the business – this time on the finance and operations side.  That retirement left a gap in these areas, and Ed stepped up to fill the gap, as he always did.  It didn't mean his load got any lighter in the field or as a salesperson.  It just meant that more folks would come to rely on steady Ed Swanson – a burden he has always borne quietly and willingly, without a second thought.  Ten years later, the remaining owner of Al's Asphalt wanted to retire, and

he offered Ed the opportunity to buy his family business even though Ed wasn't family.  After years of acting like an owner, Ed became the majority owner of Al's Asphalt in 2018.

### 7.    Taking Disappointment Well (Again)

As the Court knows from this case and others on its docket, seeking and providing non-competitive bids was, until recent years, something that happened on occasion in the asphalt paving industry in Southeast Michigan.  It was not something that Al's Asphalt or Ed Swanson personally did on a regular basis.  It impacted and was a part of less than two percent of Al's Asphalt's business from 2013 to 2019.  Almost all the volume of commerce the government attributes to Ed Swanson occurred before he purchased the company.  Of the dozen or so jobs that make up that volume of commerce, only one or two are jobs Ed Swanson personally bid.  And, at the time, it was something that Ed did not even know was wrong.[3]  In fact, comp bidding was often done at the request of customers who were struggling to get more than one quote for a project on their own.

But these are no excuses, and Ed Swanson understands and accepts that.  It did happen.  And it was and is wrong, as Ed has learned the hard way.  Just a few

---

[3] Tellingly, the Probation Office declined, over the government's objection, to impose an Adjustment for Role in the Offense as a manager or supervisor in its Revised Presentence Report & Addendum for Mr. Swanson.  ECF # 35, PageID.291, 305-310.

months after purchasing the company into which he'd poured 25 years of his life, Ed was approached by federal investigators in 2018 who informed him that he and the company were being investigated for antitrust violations.

Ed fully cooperated with the government's investigation and ensured the company did too.  Then for years, it was radio silence from the government.  When he finally learned in 2023 that the government intended to charge him and the company, Ed was devastated.  Not just because of the possibility of punishment, but because he had let others down.

### 8.  *Impact on Others*

Up to this point, the Court has read the history of Ed Swanson in mostly his own words.[4]  Any embellishment or attempt at anything other than quiet humility in the telling of the tale is undersigned counsel's doing, not his.  But to understand the significance of Ed Swanson's story and its impact on his family, friends, co-workers, employees, and community, the Court needs to hear it from them.  And it will hear it in droves when the Court reads the 28 remarkable letters attached as exhibits to this memorandum.

---

[4] To give the Court an opportunity to *hear* some of his story directly from him, Mr. Swanson has prepared a short video which the Court will find at **Ex. 29**.

Counsel won't attempt to summarize all the character letters here, but some examples will give the Court a preview of just how much Ed Swanson means to the people in his life.

- "Ed is the oldest of my five children.  He has truly been a delightful child, adolescent, and now an adult his entire life… We sadly lost my husband (Ed's father) in 2001.  He immediately & quietly stepped up to the responsibilities in our family.  He not only helps me quietly with my financial responsibilities, but constantly makes sure all is well with me and the family.  And the amazing thing is I never ask.  He just swoops in and handles a lot!... Ed is always there when there is a need.  The beautiful & remarkable thing part of Ed is that [it's] always done humbly & quietly." **Ex. 1**, Doris Swanson Letter.

- "I am writing to you today to share insight into the character of my husband, a man whose kindness and compassion shine through in every aspect of his life…  Throughout our marriage I have watched my husband help/support those near him in personal matters.  This is one of the biggest attributes of his, the pure dedication to those around him.  Often, leaving home to sit bedside in hospitals praying night after night, supporting families when they were at their lowest.  Helping anyone he could and providing guidance over the phone was also a near-nightly occurrence for the last 3 decades.  My husbands' character stands above any other accomplishment or feat by a longshot and should not be understated." **Ex. 2**, Betty Swanson Letter.

- "Ed is the eldest of our siblings and in our family that is not just a title, it is a role that was put on him when he was young.  With that care more responsibilities and expectations, and Ed never questioned that, he just always rose to the occasion when needed…  When something would arise, no matter what the time of day or night, he would come and be our rock…. Ed is also involved in supporting the community we grew up in…  He is a blessing to so many and has helped change people's lives when it was needed most…  One time he had noticed a homeless man sleeping under a viaduct, and decided to stop and speak to the man.  He ended up giving him a job, arranging a place for him to [temporarily] stay and in time, the man's life was turned around…  One of his employees had a lot of missing teeth and Ed could tell he was

embarrassed of the condition he [was] in.  Ed met with him privately and offered to help him get new teeth.  That act of kindness had such an impact on the employee's life."  **Ex. 3**, Sandy (Swanson) Shackelford Letter.

- "Most children have a role model in their lives, or at the very least, someone they admire and strive to emulate.  Someone they watch, listen to, learn from, and aspire to become.  I'm fortunate to say that for me, this person wasn't a distant celebrity or an abstract ideal.  It was my father."  **Ex. 4**, Anthony Swanson Letter.

- "One of my many favorite qualities [about my Uncle Ed] is that he does not help others in order to receive anything back.  He helps others without anyone knowing, often times asking me to '…keep it between you and I.'"  **Ex. 5**, Tyler Warga Letter.

- "I have been painting parking spaces for over 40 years.  During that time, I watched Ed Swanson grow with Al's Paving for 30 years.  Ed started at Al's as a truck driver then quickly went up the ranks from there; learning nearly every position within the company…  I watched over the years that the guys around Ed started going to him for advice.  He would calmly steer them in the right direction.  It didn't take long before everyone knew [that] to get some calm advice for almost anything they could go to Ed Swanson."  **Ex. 6**, Charley Orozco Letter.

- "Prior to working with Al's, I would talk to the employees that would be working on my projects and ask how they like working at Al's and how it is working for Ed?  I never heard a negative statement about working for Al's and heard nothing but praise regarding the man who Ed is.  His reputation not only with his employees but with contractors and communities all over metro Detroit is impeccable.  He is highly regarded as an owner who cares about his people and fulfills his promises."  **Ex. 7**, R. Jesse Kyle Letter.

- "True leaders in life are humble, quiet in how they lead, and most importantly they always try to make everyone around them better, every single day.  Ed Swanson is the definition of a true leader, period.  He is a man of reliability, integrity, trust, a family man, and most importantly,

a man of his word.  I know that if I was to ever need anything, Ed would be just one phone call away."  **Ex. 8**, Stephen Lowe Letter.

- "…Ed's company and my company were both doing a project for Oakland Christian Church, which I attended at that time. Unfortunately, the church did not have the funds to pay for the work they contracted…  [E]ven though Ed did not attend the church, he took the same position I did.  We waited for the church to make partial payment when it could, and ultimately released the church from much of what was owed.  I know Ed works for churches and charities at his direct cost, so him releasing the church from much of what they owed would've been a substantial cost and hardship to his company."  **Ex. 9**, Chris Yatooma Letter.

- "A 42-year old man passed away very unexpectedly and my funeral home was serving his family's funeral needs.  During the arrangements, the man's father mentioned that he had worked on the property several times while working for Ed's company and asked if we could set up a payment plan as finances were very tight for the family.  Not knowing the man, I called Ed to verify his employment.  When Ed heard that this man's son had died, he told me to have the family pick out whatever they wanted for the funeral and to send him the bill.  He did not want his man's family to worry about finances at a time when they needed to grieve.  4 months later, the man who had been making the arrangements for his son died very suddenly.  Ed notified me of the man's death and told me to do the same thing that I had done 4 months earlier for the man's son."  **Ex. 10**, Daniel Dwyer Letter.

- "I am a Police Officer and currently serve as a Narcotics Detective.  In September of 2022, my coworker and close personal friend was shot multiple times in the line-of-duty, rendering him paralyzed and fighting for his life.  The days that followed this tragic incident seemed to blur together, but what is vivid in my mind is Ed Swanson quietly reaching out to me and asking "What can I do?"  **Ex. 11**, Chris Arnoldy Letter.

- "Ed is deeply committed to his faith and exudes that in his everyday life.  Ed lives his life witnessing and sharing his love for his Lord and Savior Jesus Christ.  I have personally benefited from his wisdom and strong witness."  **Ex. 12**, Kenneth Kelbert Letter.

14

- "[Ed] has helped me minister to the poor sick in Detroit and around the world.  To say [I] don't know how I could have done it without him isn't an over reaction…  I told him once that as Simon helped Jesus carry the cross, he has helped me carry mine.  He has never let me tell anyone until this time…  I was a senior pastor of a large church in Melvindale, bordering on Detroit.  It was a remodeled K Mart building.  We were a poor congregation.  One winter it snowed so much by the March board meeting we're $22,000 in the red.  The board tried to cheer me up, but I was inconsolable.  The next morning I dragged myself in.  My secretary said someone was here to see me.  It was Ed.  He said he had something for me.  When I saw the $30,000 check, I asked him if someone had told him about last night's meeting?  He said, "no" [and] I began to cry.  I couldn't help it.  I told him that he couldn't buy my prayers, but that I would pray for him every day for the rest of my life, everyday and I have." **Ex. 13**, Bishop Frank Julian Letter.

- "I have watched [Ed] grow over the years in Christ-like character and personal kindness.  Ed is a man of integrity with a heart that cares for the needs of others.  He often looked for opportunities to generously give to the needs of the hurting and less fortunate, never asking for recognition.  If he knew that someone had a need, he would quietly seek to meet that need without anything in return." **Ex. 14**, Pastor Patrick J. Bossio Jr. Letter.

- "One word comes to mind to describe Ed; virtuous.  As much discipline and sacrifice it takes to practice virtue, Ed's character is quickly and consistently proven to align with this practice…  [H]is perseverance and love for those around him always prevails." **Ex. 15**, Justin Rada Letter.

### 9.  *The Big Picture*

In an otherwise exemplary life, Ed Swanson made a series of poor choices when it came to the bid-rigging activity that brings him before the Court.  He was too trusting.  He should have asked "why are we doing this?"  He should have said "are you sure about this?"  He should have consulted a lawyer.  He didn't do those

15

things, and he must live with the consequences of his failure.  Ed understands, accepts, and is truly sorry for his poor choices.

But human beings are not the sum total of their poor choices.  And the sentencing factors do not require courts to view the defendants who stand in front of them as such.  *See, e.g.*, *Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"); *United States v. Coughlin*, 2008 WL 313099, at *9 (W.D. Ark. Feb. 1, 2008) ("A court that succumbs to apathy, bred by repetition, will cease to see defendants as individuals, with pasts and potentials, with humanity and promise").  A sentence of probation (and the concurrent consequences of a felony conviction) will sufficiently penalize Ed Swanson considering the nature of his offense and his otherwise overwhelmingly positive personal history.

## B. Ed Swanson is Remorseful, Poses Little to No Risk of Recidivism, and Poses No Threat to the Public (§ 3553(a)(2)(A)-(C)).

Ed Swanson regrets his actions and is prepared to accept responsibility for them.  Ed was "the first individual to cooperate and provide significant and useful information," as the government's Combined Motion and Brief for Downward Departure under U.S.S.G. §5K1.1 notes.  ECF # 31, PageID.211.  Ed's information "was truthful and complete."  *Id.*  Ed "agreed to a voluntary interview in which he

provided information about various aspects of the bid-rigging conspiracies, including specific practices and terminology used by the conspirators, and specific instances of illegal conduct, which was corroborated by other witnesses and documentary evidence." *Id.* "The timeliness of [Ed's] cooperation allowed the United States to focus its investigation into the asphalt paving industry and save prosecutorial and investigative resources." *Id.* Candidly, undersigned counsel hoped that Ed Swanson's timely, truthful, significant cooperation and first cooperator status might help merit a declination of prosecution in this matter. But when they didn't, Mr. Swanson required no indictment in this case. He immediately agreed to be charged by Information and worked with the government quickly and cooperatively to reach Rule 11 Plea Agreements for himself and Al's Asphalt.

To that end, the Presentence Reports for both Ed Swanson and Al's Asphalt recommend downward departures for clear acceptance of responsibility. ECF # 29, PageID. 193; ECF # 28, PageID.178. And this is not a case where the defendant "agree[d] to plead guilty only two or three weeks before trial, when his lawyer has finally convinced him that he is cornered." *United States v. McQueen*, 2006 WL 3206150, at *7 (S.D. Ind. Apr. 20, 2006). "[I]mmediate acceptance of responsibility is a test of character." *Id.* (finding that "[t]he one-size fits-all discount [for acceptance of responsibility] in the Guidelines" did not sufficiently reflect the

defendant's actions for purposes of sentencing and granting a significant departure from the sentencing guidelines where the defendant pled guilty quickly).

Likewise, Ed Swanson poses no risk of recidivism.  Aside from a minor traffic infraction 24 years ago, this is his first arrest and conviction, making him exceedingly unlikely to reoffend.  *See* Ruben Castillo et al., *Recidivism and the "First Offender"* (May 2004), U.S. Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (finding that the recidivism rate of zero point offenders "is substantially lower" that the rates for offenders with only one criminal history point and further, that the "low recidivism rate" of a subset of zero point offenders made the group "stand out"); Tracy Kyckelhahn and Tricia Cooper, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017), U.S. Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf (noting that "offenders who had no prior contact with the criminal justice system had a rearrest rate 11.7 percentage points lower than offenders with prior contact (25.7% compared to 37.4%)" and that "[b]oth groups had a lower rearrest rate than offenders with one criminal history point (46.9%)").

Indeed, Ed Swanson is a true first-time offender, with a total criminal history

score of zero.  ECF # 29, PageID.194.  For a true first-time offender like Ed, a within-range sentence can be *greater* than necessary to prevent reoffending.  *United States v. Fathalla,* No. 07-CR-87, 2008 WL 4501057, at *4 (E.D. Wis. Sept. 29, 2008) (sentencing defendant to home confinement after noting first-time offender status); *United States v. Baker,* 445 F.3d 987, 992 (7th Cir. 2006) (affirming a below-Guidelines sentence based in part on the defendant's "lack of criminal history"); *United States v. Paul,* 239 F. App'x 353, 354 (9th Cir. 2007) (vacating a within-Guidelines sentence because "the district court did not adequately consider . . . strong mitigating evidence" that the defendant "was a first-time offender with absolutely no criminal record whatsoever.").

Moreover, Ed Swanson's advanced age also strongly suggests that he poses a minimal chance of recidivism.  Research by the Sentencing Commission shows that individuals in Criminal History Category I who are over 50 years old at the time of sentencing recidivate at a rate of only 6.2% — the lowest of any age group. *See* Ruben Castillo et al., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 28 (May 2004), U.S. Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.[5]

---

[5] This number is likely even lower for those truly similarly situated to Ed Swanson, as the available data does not reveal further recidivism rates which account for the difference between 0 CHC points and 1 CHC point.

19

Should the Court have any doubts about Mr. Swanson's likelihood of recidivism, empirical evidence suggests that there is no relationship between sentence length and deterrence, regardless of the type of crime.  *See* Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, PRISON J 91(3), 60S (2011) ("Custodial sentences do not reduce recidivism more than noncustodial sanctions"); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 4, 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); *United States v. Sandoval-Enrique*, 171 F. Supp. 3d 1190, 1203 (D.N.M. 2016) (surveying "the leading research and conclud[ing] that the weight of the research indicates that incarceration—imposing it at all or increasing the amount imposed—has little to no significant correlation to recidivism") (citing T. Bartell & L.T. Winfree, *Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders,* 15 Criminology 387 (1977) (outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated).  The Court need not impose a period of incarceration to ensure that Ed Swanson will not re-offend.

Nor is incarceration necessary for adequate deterrence, either general or specific.  From a personal perspective, Ed Swanson is deeply ashamed and regretful

of his actions.  Prior to the Information in this case, Ed's only interaction with the justice system came from a decades-old traffic infraction.  Now, Ed must live with the fact that his actions, alone, may cause his separation from his wife, his children, his aging mother, and his employees, all who rely heavily on him for support.  He recognizes that his actions may also jeopardize his family in the long term, even after punishment is served, considering he and his company now have felony convictions on their records.  Current, former, and prospective customers inquire about it regularly, as do industry colleagues and acquaintances.  Ed and his company have already been suspended by the Federal Highway Administration and Michigan Department of Transportation.  He has certainly begun to experience the real-life consequences of his wrongdoing.  Ed will never put himself, but more importantly to him, his family and others who depend on him at risk again.

From a societal standpoint, incarceration is likewise unnecessary to deter others.  The government's investigation has put a stop to anticompetitive bid-rigging in the Southeast Michigan asphalt paving industry.  News of the federal felony charges stemming from the investigation have already spread like wildfire in the local papers and elsewhere.  Being sentenced by a federal court alone communicates the swift consequences that will be imposed on anyone who attempts to replicate the instant offenses.  No additional punishment for Ed Swanson is necessary to drive home that point.

Incarcerating Ed Swanson is also not necessary to protect the public, as the Presentence Report acknowledges.  ECF # 29, PageID.204.  His offense, while a serious lapse in judgment, was nonviolent and caused no physical harm to any member of the public.  *Id.*  He presents literally zero risk of ongoing harm to others.  On the contrary, Ed Swanson has spent his whole life quietly and selflessly giving back to his family, friends, co-workers, employees, and the metro Detroit community.

**C.   As to Defendant Al's Asphalt, The Court Should Impose a Sentence within the Parties' Jointly Recommended Sentencing Agreement Found in the Rule 11 Plea Agreement.**

As reflected in the Rule 11 Plea Agreement between Al's Asphalt and the government, the parties have agreed to jointly recommend that the Court sentence the company within the applicable Guidelines range ("Recommended Sentence").  ECF # 21, PageID.87-90.  The Recommended Sentence, which the parties agreed is reasonable, includes:

- Payment of a criminal fine of no less than $731,549 and no more than $914,436.

- Payment of a $400 special assessment per count under 18 U.S.C. § 3013(a)(2)(B).

- No order of restitution.

- No term of probation.

*Id.*  The parties further agreed that Al's Asphalt would request that the fine be paid

in annual one-sixth (1/6) installments over a five-year period, with the option to prepay the remaining balance at any time, and that the government would take no position on this request.  *Id.*at PageID.88.

Pursuant to the parties' agreement and in the interests of justice, Mr. Swanson and Al's Asphalt, through undersigned counsel, respectfully request the Court to impose a Recommended Sentence as to Al's Asphalt as follows: (1) a criminal fine of $731,549, payable in annual one-sixth (1/6) installments as described above and in the Rule 11 Plea Agreement; and (2) payment of a $400 special assessment per count under 18 U.S.C. § 3013(a)(2)(B).  A fine of $731,549 reflects 20% of the volume of affected commerce in this case.  ECF # 28, PageID.177.  This sentence would be sufficient but not greater than necessary to punish Al's Asphalt, which has fully cooperated in the investigation (and prosecution) of this matter and has "clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct."  *Id.* at PageID.178.

## IV.   CONCLUSION

At bottom, the world is a far better place with Ed Swanson in it than apart from it.  It would be a reasonable exercise of this Court's discretion to impose a sentence of probation in this matter as to Mr. Swanson and a criminal fine as to his company.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:   s/Thomas W. Cranmer
       Thomas W. Cranmer (P25252)
       840 W. Long Lake Rd, Suite 150
       Troy, MI 48098
       Telephone: (248) 267-3381
       cranmer@millercanfield.com
       *Attorney for Defendants*

Dated:  May 31, 2024

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 31, 2024, I electronically filed the foregoing document, with the Clerk of the court using the ECF system which sent notification of such filing to all attorneys of record.

s/Thomas W. Cranmer
Thomas W. Cranmer (P25252)
Miller Canfield Paddock & Stone, P.L.C.
840 West Long Lake Road, Suite 150
Troy, Michigan 48098
Telephone: (248) 879-2000
cranmer@millercanfield.com
